IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHRIS E. FRANKS, )
)
Plaintiff, )
)
)
v. ) Civil Action No. 1:18-cv-436
)
)
TRIPLE CANOPY, INC., ET AL., )
)
Defendants. )

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

Plaintiff Chris Franks, an African American, was employed by Triple Canopy, Inc. ("Triple Canopy") as a Force Protection Officer ("FPO") at Camp Buehring in Kuwait. Defendants Captain Justin Good, FPO John Sheldon, and FPO John Williams were also employed by Triple Canopy. Defendant Constellis, LLC ("Constellis") is the parent company of Triple Canopy. Triple Canopy and Constellis are government contractors that provided security services at U.S. Army installations across Kuwait, including at Camp Arifjan and Camp Buehring. Plaintiff was hired by Triple Canopy as an FPO in March of 2017.

Plaintiff's job was to provide security services at Camp Buehring, and his specific duties included conducting vehicle searches and checking the identification cards of individuals

entering or leaving the camp. Plaintiff's day-shift supervisor was Lieutenant Justin Adams, and there were several sergeants and senior sergeants between Plaintiff's FPO level and Lieutenant Adams who could give direction to the FPOs, including Sergeant Donnell Hudson and Senior Sergeant Gregory Graham. According to Triple Canopy's chain of command, FPOs reported to Sgt. Hudson, who reported to Senior Sgt. Graham, who reported to Lt. Adams, who reported to Deputy Regional Manager Denzil Kearse. Hudson, Graham, Adams, and Kearse are all African American.

All Triple Canopy employees working onsite in Kuwait received annual training on harassment, discrimination, and human rights issues. Franks also received a copy of Triple Canopy's Equal Employment Opportunity Policy ("EEO Policy"). The Triple Canopy EEO Policy prohibits discrimination and harassment of any kind and states that Triple Canopy will investigate and take appropriate action to address any prohibited conduct, which includes the distribution, display, or discussion of any written or graphic material that ridicules, degrades, insults, belittles, or shows hostility or aversion toward an individual or group because of race. The EEO Policy also required prompt reporting of all incidents alleging policy violations to an employee's supervisor, a manager in the HR Department, the Legal Department, or via the Company's Ethics Hotline.

On July 15, 2017, Franks was assigned to a twelve hour shift to guard Post 20, a guard post situated at the entrance/exit to an airfield in the middle of Camp Buehring. Franks and FPO Kyle Carter arrived on July 15, 2017 at approximately 5:30 a.m. to relieve FPOs Sheldon and Williams from their 12-hour shift. During the day, Franks and Carter manned the gate at Post 20, allowing authorized personnel to drive onto the air field. Post 20 contained a guard shack with two rooms and a small opening for a doorway between them. The back room of the guard shack contained a refrigerator and wall lockers along part of one of the walls. At 10:30 a.m., approximately five hours into his shift, Franks went to the back room of the guard shack to retrieve a broom and saw a rope in the back corner of the room hanging from the ceiling in the shape of a noose. The rope could only be seen by walking into the room and looking into the corner.

After seeing the noose, Franks notified Carter and radioed Hudson, the sergeant on duty. Sgt. Hudson immediately came to Post 20 and contacted Senior Sgt. Graham. Sgt. Hudson also asked Franks and Carter to prepare written statements. Hudson also completed an Incident Reporting Form, known as a "Spot Report," which was required by company procedure. Graham also notified Camp Buehring's Deputy Camp Manager Denzil Kearse.

Throughout the remainder of Franks' shift, several Triple Canopy managers came to Post 20 to document the incident, including

3

Graham, Adams, and Kearse. Triple Canopy senior management were also notified on July 15, 2017, including highest-ranking project manager, Christopher Rector, and the Deputy Project Manager Herbert Ward. On July 16, 2017, Ward traveled to Camp Buehring with Bonnie Wilson, the Human Resources representative. Ward and Wilson then began interviews of witnesses, including Franks.

Franks told Ward and Wilson that he believed that Sheldon and Williams, who had worked the previous twelve hour shift, had hung the noose. Franks also stated that neither Sheldon nor Williams said anything that was unprofessional during their brief interaction when Franks and Carter arrived to relieve them of their shift. Franks also stated that he had never had any negative interactions with Sheldon or Williams before the incident.

After concluding their interviews, Ward and Wilson could not determine who hung the rope. Ward did decide, however, to separate Franks from Williams and Sheldon. As a result, Williams and Sheldon were transferred to Camp Arifjan on July 15, 2017. Ward also sent an email to all Triple Canopy employees working in Kuwait that stated that a potentially derogatory racial symbol was discovered and further reiterated the Company's commitment to equal employment opportunity and its prohibition on harassment and discrimination. Ward's email also summarized the Company's reporting procedures and attached a copy of the EEO Policy.

On July 19, 2017, Franks confronted Williams in the lobby of the building where they lived, outside of Camp Buehring and located near Kuwait City. Although by this time Williams had been transferred to another base, he still resided in the same building as Franks. Franks and Williams' conversation was initially heated, but Williams eventually apologized to Franks "if [he] did anything to hurt [or] offend [Franks]." During the interaction, Williams did not indicate why he was apologizing or admit to hanging the noose. On July 22, 2017, Williams resigned without notice and was placed on Triple Canopy's "no rehire" list. Sheldon was also separated from Triple Canopy shortly after the conclusion of the investigation and placed on the no rehire list.

On July 20, 2017, Franks requested a housing change. Housing for Triple Canopy's operations in Kuwait is handled by the prime-contractor, Vectrus, and Triple Canopy has no involvement with where Triple Canopy personnel reside in Kuwait. All housing assignments and requests to change housing are also handled by Vectrus. Vectrus approved Franks' request for housing relocation and reassigned to the Sulabikhat housing complex. On July 23, 2017, Vectrus sent Franks an email informing him that he could pick up the keys to his new apartment and begin his move. Franks responded on July 25, 2017 and stated that he would not be able to move until Friday, July 28, 2017, when he had his next day off. Because Vectrus' housing office was closed on Fridays, Triple Canopy

5

arranged for Franks to have a day off on Sunday, July 30, 2017, so that Franks could complete his move. The move to the Sulabikhat complex reduced Franks' commute to work by 30 minutes, and all Triple Canopy personnel that resided in the complex worked at Camp Buehring.

Between July 23, 2017 and July 30, 2017, Triple Canopy offered to relocate Franks to other positions, including certain opportunities near Franks' hometown in Raleigh, North Carolina. On July 30, 2017, Franks moved into his new apartment in the Sulabikhat complex. On the same day, Franks resigned from Triple Canopy.

Despite Franks' resignation, Triple Canopy and Constellis continued their investigation of the incident. On July 31, 2017, Todd Rouse, Constellis' Senior Director of Global Compliance, informed Franks that he would travel to Kuwait to interview him and other Triple Canopy employees.

Rouse made several recommendations as a result of his investigation, including additional training on incident reporting, preventing harassment, and human rights overview training. On August 10, 2017, Rouse performed on-site training for all Triple Canopy managers in Kuwait.

In his Amended Complaint, Franks alleges two counts of discrimination pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Count I of the Amended Complaint alleges

a claim for Race Discrimination in violation of Title VII of the Civil Rights Act of 1964. Count II, "Intentional Race Discrimination," alleges that the Defendants created a "hostile work environment" in violation of 42 U.S.C. § 1982 and Title VII. Defendants Triple Canopy and Constellis moved for summary judgment on July 12, 2019.

Under Federal Rule of Civil Procedure 56, a court should grant summary judgment if the pleadings and evidence show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made, the opposing party has the burden to show that a genuine dispute of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). This Court finds this case is ripe for summary judgment.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). To establish

a prima facie claim for intentional discrimination under Title VII, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. Coleman v. Md. Ct. of App., 626 F.3d 187, 190 (4th Cir. 2010).

An "adverse employment action" must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Conduct that does not detrimentally affect the terms, conditions, or benefits of employment cannot constitute adverse employment action. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 650-52 (4th Cir. 2002). Regardless of how a plaintiff pursues a discrimination claim under Title VII, the absence of any adverse employment action is fatal to a plaintiff's claim. See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004).

Franks argues that the impact of seeing the noose, coupled with the alleged failure by the Defendants to take meaningful corrective action, forced Franks to resign. When an employee resigns in the face of "working conditions [that have] become so intolerable that a reasonable person in the employee's position would have felt compelled to resign[,]" Title VII may treat the

8

resignation as tantamount to a discharge for purposes of the "adverse employment action" element. Pa. State Police v. Suders, 542 U.S. 129, 141-43 (2004). But "when an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has been no adverse employment action." Hartsell v. Duplex Products, Inc., 123 F.3d 766, 775 (4th Cir. 1997).

Here, even assuming that Franks has properly raised his constructive discharge theory,[1] Franks cannot satisfy the standard that he was subject to working conditions that were so intolerable that a reasonable person would resign. See id. at 141; United States EEOC v. Consol. Energy, Inc., 860 F.3d 131, 144 (4th Cir. 2017) (standard for constructive discharge is "objective intolerability"). In attempting to satisfy this standard, Franks' argument solely relies on a single incident of seeing the noose on July 15, 2017. However, this isolated incident cannot give rise to objective intolerability, particularly where, as here, the Defendants swiftly investigated the incident, retrained staff, and promptly sought to accommodate Franks with new housing. The Defendants also offered to potentially relocate him to a new job near his home in North Carolina. Indeed, even after Franks' resignation, Triple Canopy's management continued to investigate

---

[1] See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (plaintiff is not permitted to raise new claims at summary judgment without first amending complaint).

9

the incident and conducted in-person training on incident reporting, harassment prevention, and the company's EEO Policy. Sheldon and Williams, the FPOs working at Post 20 immediately prior to Franks and Carter, both resigned soon after the incident and were placed on Triple Canopy's "no rehire" lists. And despite a brief but heated interaction with Williams sometime after the incident, Franks ultimately described Williams' demeanor as "apologetic" about the incident.

Even assuming that Franks could establish an adverse employment action, Count I would still fail because Franks also cannot establish that he was treated differently from similarly situated employees outside of his protected class. White v. BFI Waste Servs., LLC, 375 F.3d 288, 295-96 (4th Cir. 2004) (plaintiffs' inability to establish disparate treatment fatal to Title VII claim). Here, Franks argues that he was treated differently because the Defendants failed to follow procedures to investigate the incident, and because he was moved into "worse" housing conditions after the incident. However, the undisputed facts show that Triple Canopy and Constellis swiftly took steps to investigate the incident and that Franks himself requested the housing transfer. Franks' new housing complex, which reduced his commute by 30 minutes, was also where most of the Triple Canopy personnel that worked at Camp Buehring lived. For the foregoing

reasons, the Defendants' Motion for Summary Judgment on Count I of the Amended Complaint is granted.

The Defendants next argue that they are entitled to summary judgment on Count II, "Intentional Race Discrimination" based on a hostile working environment.

It has been recognized that because an employee's work environment is a "term or condition of employment," Title VII also creates a "hostile working environment" cause of action. The standard used to evaluate a claim of hostile work environment under 42 U.S.C. § 1981 is the same as under Title VII. Freeman v. Dal-Tile Corp., 750 F.3d 413, 424 n. 7 (4th Cir. 2014)(citing Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001)). For a claim of racially hostile work environment to survive summary judgment, a plaintiff "'must demonstrate that a reasonable jury could find the harassment (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.'" EEOC v. Xerxes Corp., 639 F.3d 658, 668 (4th Cir. 2011)(quoting Spriggs, 242 F.3d at 183-84)). The plaintiff must also present "sufficient evidence . . . that there is some basis for imposing liability for the harassment on the employer." Spriggs, 242 F.3d at 184.

Franks has not endured sufficiently severe or pervasive conduct to establish a hostile work environment claim under Title VII or 42 U.S.C. § 1981. The severe and pervasive element of a

hostile work environment claim is both subjective and objective. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Importantly, courts must look at the "totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011)(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

Franks argues that one isolated incident—seeing the noose at Post 20—is sufficiently "severe and pervasive." However, a single, isolated incident is generally not sufficient to establish severe and pervasive conduct, particularly where, as here, the conduct was by a coworker as opposed to a supervisor or manager. Ellerth, 524 U.S. at 763 (recognizing that the severity of the conduct can vary depending on its source because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character."); see also Boyer-Liberto v. Fontainbleau Corp., 786 F.3d 264 (4th Cir. 2015) ("viable hostile work environment claims often involve repeated conduct."). Franks cannot establish that this isolated incident, ostensibly committed by a co-worker, was sufficiently severe and pervasive.

Defendants Triple Canopy and Constellis are also entitled to summary judgment on Count II because they took reasonable care

12

to prevent and correct any harassing behavior, and Franks unreasonably failed to take advantage of the preventive or corrective opportunities provided to him. See Ellerth, 524 U.S. at 765. As noted supra, the Defendants swiftly took action after the incident was reported. The Defendants also accommodated Mr. Franks' request to relocate housing, continued to investigate and re-train staff even after Franks had resigned, and offered to potentially relocate Franks to a position closer to his home in North Carolina.

For the forgoing reasons, this Court finds that Defendants Triple Canopy and Constellis are entitled to summary judgment. Because Franks failed to comply with the Court's June 19, 2019 Show Cause Order, Defendants Justin Good, John Sheldon, and John Williams are dismissed pursuant to Fed. R. Civ. P. 4(m). Defendants Triple Canopy and Constellis' Motion to Dismiss Pursuant to Rule 41(b) or in the Alternative Motion for Sanctions Pursuant to Rules 16(f) and 37(b)(2)(A) is denied as moot.

An appropriate order shall issue.

/s/ Claude M. Hilton
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
September 9, 2019